[Cite as *State v. Tuggle*, 2023-Ohio-3965.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

State of Ohio                                          Court of Appeals No.  L-22-1298

　　　　Appellee                               Trial Court No.  CR0202201699

v.

Sharonda Tuggle                              **DECISION AND JUDGMENT**

　　　　Appellant                               Decided:  October 27, 2023

* * * * *

Julia R. Bates, Lucas County Prosecuting Attorney, and
Brenda J. Majdalani, Assistant Prosecuting Attorney, for appellee.

Brad F. Hubbell, for appellant.

* * * * *

**MAYLE, J.**

**{¶ 1}** Following a bench trial, defendant-appellant, Sharonda Tuggle, appeals the

November 23, 2022 judgment of the Lucas County Court of Common Pleas, convicting

her of murder and felonious assault, and sentencing her to a mandatory prison term of 15

years to life in prison.  For the following reasons, we affirm the trial court judgment.

# I. Background

{¶ 2} Sharonda Tuggle was charged with murder, a violation of R.C. 2923.02(B) and 2929.02, an unspecified felony, and felonious assault, a violation of R.C. 2903.11(A)(2) and (D), a second-degree felony, in connection with the stabbing death of her boyfriend, L.S. Tuggle filed a notice of claiming self-defense, waived a jury trial, and elected to have her case tried to the bench. At trial, the state presented evidence from two responding officers, investigating detectives, the deputy coroner, a forensic scientist from the Ohio Bureau of Criminal Investigation, and the victim's brother. Body camera footage and a recorded interview of Tuggle were admitted as exhibits. Tuggle testified in her own defense. The following evidence was presented.

## A. The State's Case-In-Chief

### 1. The Responding Officers

{¶ 3} On April 23, 2022, Tuggle called 9-1-1 at 8:44 a.m., and reported that her boyfriend, L.S., had been stabbed in his chest. When asked by the 9-1-1 operator what happened, Tuggle told her that he had a knife and he fell.

{¶ 4} Officers Todd Mikolajczyk and Derek Adams arrived, separately, at 1181 Artis Place in Toledo, Ohio, to find L.S. lying naked on the bathroom floor with no signs of life. They observed a stab wound to the center of his chest. There was a bloody towel on the ground and blood on the floor. The door to the bathroom had two holes in it; there was blood on the door that was dark and starting to clot. There was a knife lying on the floor next to L.S.'s body, which Officer Mikolajczyk moved to the sink so that

2.

emergency personnel would not step on it. The fire department arrived and started treating L.S.

{¶ 5} Tuggle was screaming when officers arrived. She was panicked, distraught, and pacing, repeatedly inquiring if L.S. was going to be okay. She had blood on her hands and pants. She told officers that she and L.S. had been drinking earlier in the night and got into an argument at Central Hot Dog (what Tuggle calls "the greasy spoon"). She described that L.S. was not acting right. He left Central Hot Dog and went to a relative's apartment. Later, Tuggle picked him up and brought him back to the Artis Place apartment.

{¶ 6} Once back at the apartment, L.S. drank more, and he and Tuggle had sex. Afterwards, L.S. went to take a shower. Before doing so, he went downstairs to get his house shoes. He also got a knife, which he took to the bathroom to lock the defective lock on the bathroom door. Tuggle said L.S. was yelling and she heard him say he couldn't do it anymore. She said that L.S. stabbed himself, sat on the side of the tub holding a towel on his chest, then fell to the ground. Tuggle told officers that L.S. suffered from anxiety and schizophrenia. She implied that he had committed suicide. Her description of the incident did not make sense to the officers. Tuggle was transported downtown to be interviewed.

{¶ 7} Tuggle never told the officers that L.S. was acting aggressively toward her, that there was a physical altercation between them, that she was afraid of L.S., that L.S.

3.

had attacked her, that L.S. threatened her, that she and L.S. were fighting over the knife, or anything to indicate that she stabbed L.S. in self-defense.

## 2. L.S.'s Brother

{¶ 8} K.D. is one of L.S.'s brothers. He testified that L.S. was employed at Fresh Products. He denied that L.S. lived with Tuggle—he said that L.S. lived with his mother and stayed at Tuggle's apartment only occasionally. L.S.'s mother supported him before he got the job at Fresh Products. To K.D.'s knowledge, L.S. did not suffer from mental illness and did not take any medications. K.D. is five feet, eight inches tall and L.S. was smaller than he is.

## 3. Detective Kristi Eycke

{¶ 9} Detective Kristi Eycke went to the Artis Place apartment around 10:00 a.m. L.S. had already been taken to the hospital. By then, she knew that L.S. had died and that Tuggle had been taken into custody.

{¶ 10} Eycke walked through the apartment and took photographs. There was a blood smear and blood spatter in the second-floor landing, outside the bathroom. The bathroom door opened into the bathroom. There was damage to the outside of the bathroom door and blood spatter on the bottom third of the outside of the door; there was no blood on the inside of the door. The lock on the door was engaged on the interior side, suggesting to the detective that someone tried—unsuccessfully—to lock and close the door. There was no damage to the steel frame.

4.

{¶ 11} The floor was heavily saturated in blood. The appearance of the blood on the floor suggested to the detective that the door was open when the victim was stabbed. There was blood spatter and blood transfer on the edge of the sink. There was blood on the toilet, most pronounced in front of the toilet; the lid was closed. There was blood on the heater, located on the left side of the bathroom. The knife was on the sink; there was blood and hair on the blade and drips of blood behind the knife. The knife was collected as evidence.

{¶ 12} Although it was clear that L.S. had been stabbed in the bathroom, Eycke was unable to determine exactly where in the bathroom the stabbing occurred. Eycke agreed that L.S. could have been sitting on the edge of the tub and fallen forward when he was stabbed, but there was no blood on the tub itself and the shower curtain was closed. There was blood spatter on the bottom of the shower curtain. Eycke did not notice any standing water in the tub or any wetness.

{¶ 13} No items of evidentiary value were found in the spare bedroom. There were blood transfer stains on the comforter in the primary bedroom and on a cell phone that was on the bed. Certain evidence was collected and swabbed for DNA testing.

{¶ 14} Eycke photographed Tuggle. There was blood on the left leg of her shorts. Tuggle had no injuries—and she denied having any injuries—except for an injury to her left pinky, which Tuggle attributed to her job as a forklift driver.

5.

### 4. The Deputy Coroner

{¶ 15} Dr. Jeffrey Hudson is the deputy coroner who performed L.S.'s autopsy. He testified that L.S. had incision wounds (wounds created by a sharp object, inconsistent with blunt force) to his chest, forehead, and right upper arm. These wounds appeared to have been inflicted separately, but close in time to one another.

{¶ 16} There was a stab wound to L.S.'s right upper arm, of superficial depth. He had both an incised wound about a half a centimeter deep and an abrasion (a wound caused by sheering blunt force across the surface of the skin) on his upper left forehead. He had additional abrasions on the right side of his forehead, on his left cheek, and below his right nostril.

{¶ 17} There was a stab wound to L.S.'s chest, just left of midline. The stab wound to L.S.'s chest completely perforated the right ventricle of his heart. This would have caused him to quickly lose blood, preventing the flow of blood to the head. The knife penetrated the left fourth rib. L.S. died from the stab wound to the chest. At least a moderate amount of force would be required to inflict this wound. Dr. Hudson could not say whether L.S. was standing still or moving when he was stabbed. In addition to the fatal chest wound, there were two small abrasions on the right side of L.S.'s chest, in a state of healing. There was a contusion to the left of the stab wound, caused by blunt force injury, probably due to advance cardiac life support efforts.

6.

{¶ 18} L.S. had a blood alcohol level of .15 and a vitreous alcohol level of .18. No drugs were detected in the toxicology study. Dr. Hudson ruled the manner of death homicide.

### 5. The BCI Forensic Scientist

{¶ 19} Lindsay Nelson-Rausch is a forensic scientist with BCI. She received DNA standards for Tuggle and L.S. Tuggle's was a buccal swab, L.S.'s was a blood swab. Several items of evidence, including the knife, were submitted for DNA testing. The knife tested presumptive positive for blood. Only L.S.'s DNA was found on the blade of the knife; Tuggle's was not. The swab of a stain on the knife handle contained a mixture of DNA from L.S. and Tuggle. A major and minor contributor could not be determined, nor could it be determined whether the DNA came from blood or skin cells. A swab of the ridge detail on the knife was insufficient for comparison. A swab of the remainder of the handle (the portion that did not contain visible staining) revealed Tuggle as the major contributor and L.S. as the minor contributor.

### 6. Detective Matthew Kozlaker

{¶ 20} Detective Matthew Kozlaker testified. He walked through the apartment at approximately 9:15 a.m., after L.S. had already been taken to the hospital. Along with Detective Danielle Moody, Kozlaker interviewed Tuggle at the safety building; the interview was recorded and played at trial. Tuggle was advised of her Miranda rights. She had no injuries visible to the detectives.

7.

{¶ 21} During the interview, Tuggle provided three explanations for the stabbing. In her final version of events, Tuggle said that she and L.S. had been drinking and fighting. L.S. had a knife in the bathroom. He locked himself in the bathroom and told Tuggle he was done with the relationship. Tuggle ended up getting the knife through the opened door, then stabbed him when he charged at her. She said that after the stabbing occurred, L.S. told Tuggle that he was done with her. Tuggle did not claim that this was self-defense, and Kozlaker observed no injuries suggesting that Tuggle had been attacked. Police were unable to get latent fingerprints off the knife handle. Tuggle did not at any point say that the knife was used to cause injury to L.S.'s forehead. She said L.S. probably got the incised wounds to his forehead and arm from falling.

{¶ 22} Tuggle told detectives that she and L.S. had argued at Central Hot Dog. During that argument, she smacked L.S. upside the head with a water bottle. Tuggle never claimed to Kozlaker that L.S. slapped her at Central Hot Dog. Kozlaker confirmed with L.S.'s mother that he took a Lyft to her apartment after leaving Central Hot Dog. After their argument at Central Hot Dog, L.S. texted Tuggle that he was done. Kozlaker obtained a warrant for L.S. and Tuggle's cell phones but was unable to access either phone because they were password-protected.

{¶ 23} Tuggle told the detectives that she filed a robbery charge against L.S. in November of 2021. She said that L.S. took her cars keys and some property from her and inflicted an unspecified injury. A warrant was issued for his arrest, but he was not prosecuted because Tuggle recanted. She said that she made the whole thing up because

8.

she was upset that L.S. was seeing other women. The detective reviewed the report of that incident. He also looked for other reports involving L.S. and Tuggle, but found none.

{¶ 24} Kozlaker conceded on cross-examination that it is not uncommon for individuals to provide inaccurate information concerning the details of an incident, and he acknowledged that there are several reasons for this. He agreed that Tuggle told him that L.S. had a drinking problem, but described that his behavior the day of the incident was abnormal. Detective Kozlaker never explored Tuggle's claim that L.S. suffered from mental health issues, did not check to see if Central Hot Dog has security cameras, and did not verify the amount or types of beverages that were consumed that night.

{¶ 25} Kozlaker testified concerning Tuggle and L.S.'s relative sizes. Tuggle weighed 258 pounds as measured upon her arrest. L.S. weighed 190 pounds as measured during his autopsy.

### 7. The Recorded Interview

{¶ 26} The recording of Tuggle's interview was played at trial. As Detective Kozlaker testified, during the interview, Tuggle provided several accounts of the stabbing: (1) she didn't know how L.S. had been stabbed; (2) L.S. stabbed himself purposely; (3) L.S. stabbed himself accidentally when he opened the door into himself; (4) she put the knife through the door and L.S. was stabbed when he charged at her.

{¶ 27} According to Tuggle, L.S. brought the knife into the bathroom to lock the door. "[They had] an altercation through the door" and [L.S.] really was like trying to

9.

lock [her] out of the bathroom." Tuggle was trying to get into the bathroom. She explained that "[they were] being aggressive as fuck." At some point, L.S. cracked the door and she grabbed the knife through the door. She described that L.S. came at her. "When he came through the door, I grabbed it and I tried to stick it through the outside of the door. * * * And when he opened the door and I stuck it through and it was right there and he grabbed his chest." Tuggle dropped the knife. She said that she did not even know that he had been stabbed. After being stabbed, L.S. sat on the side of the tub and told her "I'm done with our relationship."

{¶ 28} Tuggle denied that L.S. was waving the knife around at her. She said, "[h]e never waved no knife at me or none of that." She conceded that "[she] threatened him so he threatened [her] back," but she said that "[she didn't] think he would threaten [her] with a knife." Even toward the end of the interview, Tuggle denied stabbing L.S. ("I didn't physically stab him though.") She said "[she didn't] know if he fell into it."

{¶ 29} Tuggle claimed that she did not see how L.S. got the "gash" on his head. She maintained that he hit his head both when he fell forward and when she tried to flip him over.

## B. Tuggle's Case-In-Chief

{¶ 30} Tuggle testified in her own defense. She stated that she and L.S. lived together at the Artis Place apartment, but her cousin's name was on the lease. She worked as a forklift driver and as a home health aide. L.S. usually did not have a job, but

he started a job at Fresh Products about two weeks before his death. Tuggle owned a vehicle; L.S. did not. He would use her vehicle if he needed transportation.

{¶ 31} Tuggle and L.S. met when they were about ten years old, but did not start dating until around June of 2021. She described their relationship as rocky. They had numerous domestic disputes. She alleged that "physically he was always assaulting" her. She claimed that she called the police several times, but only pressed charges in connection with the November 2021 incident "because [she] was choked a lot." She said most times she called the police, L.S. would run off, the police would write a report, and "that would be the end of it." She claimed that she was scared to go to the police, but she did so in November because it got more serious. She described that it had gotten to the point where he was choking her unconscious. Tuggle said that she sought medical treatment once because he hit her in the eye with a phone and scratched her eye. She claimed that she reported the incident, but did not go through with pressing charges.

{¶ 32} Tuggle provided additional details about the November 2021 incident. She claimed that L.S. choked her until she couldn't breathe and scratched her. Because he took her phone and keys, he was charged with robbery instead of assault. After she made the report, L.S. kicked her door in and told her she had to call the police to drop the charges. She insisted that she did not want to drop the charges and did so only because he made her. She said that the Toledo Police prepared a danger assessment and as part of that assessment, she reported that she believed L.S. was capable of killing her. L.S. was

arrested, but at L.S.'s father's insistence, Tuggle did not appear in court to pursue the charges. She did not file any additional charges against L.S. after November of 2021.

{¶ 33} Tuggle claimed that she and L.S. would get into fights, he would assault her, then go to his mom's house, but his mom wouldn't open the door because "[s]he was done with his stuff," so he would come back and kick in her door. She maintained that the assaults happened so often that there was no way she could keep reporting them. Tuggle denied that she was physically assaultive towards L.S.

{¶ 34} Contrary to K.D.'s testimony, Tuggle said that L.S. was diagnosed with schizophrenia and anxiety at Unison on Starr Avenue. She claimed that his prescriptions to treat those conditions were at her house, but he refused to take them. Tuggle said that L.S. did not have a driver's license. He would rely on her for transportation or she would pay for him to take a Lyft. She supported him financially. He would go to his mother's apartment when they fought or if he needed something from her. They argued daily. She insisted that she was not concerned that he was seeing anyone else.

{¶ 35} Tuggle said that L.S. drank every day. On April 22, 2022, she worked from 7:30 a.m. to 4:30 p.m. He got off work at 11:00 p.m. He asked her to go to the liquor store, so she did that before it closed, then picked him up at 11:00 p.m. They went down to the water, drank, drove around, then went to Central Hot Dog. They drank half a liter of Ciroc Brandy and L.S. also drank beer. Tuggle estimated that L.S. drank most of the liter of brandy and two six-packs of beer that day.

12.

{¶ 36} When they got to Central Hot Dog, Tuggle did not want to get out of the car because they got in a fight about what she had done after work and who she had seen. L.S. slapped her with the back of his hand. She stayed in the car, but then went in to get some water. While inside, she hit L.S. with the water bottle, which, she conceded, caused a visible injury to his eye. He got back in the car, then she got him a Lyft to his mother's place. The Lyft came and she went home.

{¶ 37} According to Tuggle, L.S. texted her that they were done, but she said they weren't really done—he still wanted her to come get him. She picked him up at his mother's apartment and brought him back to the Artis Place apartment.

{¶ 38} Once back at the apartment, Tuggle and L.S. drank, had sex, then began to argue again. She went downstairs to get water. He was going to take a shower. He came downstairs and got his house shoes and a knife then went back upstairs. She went back upstairs to the bedroom. L.S. was in and out between the bathroom and the bedroom. They continued to argue. He went into the bathroom and shut the door. The door wouldn't physically lock. He called her to the bathroom. He was yelling at her, and they argued through the door. L.S. wanted Tuggle to give him the bottle of liquor, but she told him it was basically gone. He opened the door, and charged at her with the knife in his hand. She snatched it out of his hand and was holding it through the door. They were tugging over the door and "he got stabbed." She tugged at the door with her right hand and had the knife in her left hand. She maintained that she had her arm extended and was trying to use the knife to prevent him from reaching her body. Tuggle claimed that she

13.

did not know where L.S. had been stabbed. She noticed something was wrong only because he stopped tugging at the door. She did not know whether her left forearm was facing up or down and did not see where she was stabbing him.

{¶ 39} When Tuggle opened the door, L.S. sat back. He was talking to her. She saw the cut on him and grabbed the towel and told him to apply pressure. He sat on the edge of the tub and collapsed forward. She believed that he may have been stabbed in the forehead and the arm when they were tugging at the door, but she could not really say because it happened so fast.

{¶ 40} When L.S. collapsed, Tuggle called 9-1-1. She was told to apply pressure and turn him over, so she did. She told the 9-1-1 operator he was snoring. She insisted that she followed the instructions of the 9-1-1 operator, including performing CPR.

{¶ 41} Tuggle claimed that she told the officers that L.S. stabbed himself or that the door played a role in causing him to be stabbed because she was afraid. She did not want to admit that she had the knife in her hand. She described that "[a]fter [she] got possession of the knife and he grabbed the door he was like charging to the door. That's how he originally got stabbed. He snatched the door and was charging, and he got stabbed."

{¶ 42} Tuggle testified that because L.S. was so angry and had already assaulted her before, she was scared that he would stab her with the knife. She maintained that she would not have been able to run down the stairs to escape him. She insisted that once she

14.

had the knife in her hand, she did not have many options. She claimed that she did not want to fatally harm L.S.—she still wanted to be in a relationship with him.

{¶ 43} As to prior untruths she had told, Tuggle acknowledged that in November of 2021, when she reported the robbery incident, she denied that L.S. lived with her. She said she lied because her name was not on the lease. Tuggle also conceded that she told the detective investigating the robbery incident that she had lied because she found out that L.S. was seeing other women. Tuggle insisted that she had called the police on L.S. before and police responded, but they only asked for L.S.'s name—they did not document the incidents. She did not have the medical records for her visit to St. Charles. She did not tell detectives about a previous incident where she claimed that L.S. had struck her in the eye. Finally, Tuggle claimed that she saw paperwork concerning L.S.'s schizophrenia diagnosis, and she explained that his medication bottles were not at the apartment the night he died because they were in the process of moving out of the apartment. Most of their things were packed in boxes.

{¶ 44} Tuggle conceded that she did not claim self-defense until Detective Mooney raised the issue. She acknowledged that she did not tell the detectives that L.S. slapped her that night. And she denied that she was banging on the bathroom door, despite telling officers and detectives otherwise.

### C. The Trial Court's Verdict

{¶ 45} The trial court convicted Tuggle of murder and felonious assault. In a judgment journalized on November 7, 2022, the trial court specifically found that "the

15.

State of Ohio proved beyond a reasonable doubt that [Tuggle] did not act in self-defense."  Tuggle's convictions merged for purposes of sentencing and the state elected that she be sentenced for murder.  The trial court imposed a mandatory prison term of 15 years to life in prison.  Tuggle's conviction and sentence were memorialized in a judgment journalized on November 23, 2022.  Tuggle appealed.  She assigns the following error for our review:

> Did the Trial Court err when it found that the State had proven beyond a reasonable doubt that Sharonda Tuggle did not act in self-defense in the assault on the victim?

## II.  Law and Analysis

**{¶ 46}** Tuggle argues that the trial court erred when it found that the state proved beyond a reasonable doubt that she did not act in self-defense when she stabbed L.S.  She maintains that "the lack of any evidence undermining her claim of self-defense and the undisputed evidence that [L.S.] had the knife when the struggle began prevents reasonable minds from reaching the conclusion reached by the trier of fact."

### A.  Self-Defense and Burdens of Proof

**{¶ 47}** Under R.C. 2901.05(B)(1), "[a] person is allowed to act in self-defense * * *."  The elements of self-defense differ depending upon whether the defendant used deadly or non-deadly force.  *State v. Baker,* 6th Dist. Lucas No. L-21-1258, 2023-Ohio-241, ¶ 27, quoting *In re N.K.,* 2021-Ohio-3858, 180 N.E.3d 78, ¶ 12 (6th Dist.).  A person may use deadly force in self-defense where he (1) was not at fault in creating the situation

16.

giving rise to the affray; (2) had a bona fide belief that he was in imminent danger of death or great bodily harm and that his only means of escape from such danger was in the use of such force; and (3) did not violate any duty to retreat or avoid the danger. *State v. Messenger,* Slip Opinion No. 2022-Ohio-4562, ¶14, quoting *State v. Barnes*, 94 Ohio St.3d 21, 24, 759 N.E.2d 1240 (2002). Under the most recent amendments to R.C. 2901.09(B), "a person has no duty to retreat before using force in self-defense * * * if that person is in a place in which the person lawfully has a right to be." *State v. Lane*, 6th Dist. Erie No. E-22-035, 2023-Ohio-1305, ¶ 14-15. The parties here agree that Tuggle had no duty to retreat.

{¶ 48} Self-defense is an affirmative defense—not an element of a crime. *State v. Messenger* at ¶ 24. In *Messenger,* the Ohio Supreme Court clarified the burden of proof where a defendant asserts a claim of self-defense under the version of the statute that became effective March 28, 2019. It recognized that "R.C. 2901.05(B)(1) triggers the state's duty to disprove self-defense so long as 'there is evidence presented that tends to support that the accused person used the force in self-defense'"—a burden that is not all that heavy. *Id.* at ¶ 20, 22 ("The reference in R.C. 2901.05(B)(1) to 'evidence presented that tends to support' self-defense indicates that the defendant's burden of production is not a heavy one and that it might even be satisfied through the state's own evidence."). As such, "a defendant charged with an offense involving the use of force has the burden of producing legally sufficient evidence that the defendant's use of force was in self-defense." *Id.* at ¶ 25. "[I]f the defendant's evidence and any reasonable inferences about

that evidence would allow a rational trier of fact to find all the elements of a self-defense claim when viewed in the light most favorable to the defendant, then the defendant has satisfied the burden," and the state must then disprove self-defense. *Id.* In that case, "the sufficiency-of-the-evidence standard of review applies to [the defendant's] burden of production and a manifest-weight-of-the-evidence standard of review applies to the state's burden of persuasion." *Id.* at ¶ 26.

## B. The Standard of Review

{¶ 49} Tuggle argues that "the evidence presented at trial was insufficient to support a finding that the State had proved, beyond a reasonable doubt, that she did not act in self-defense when she stabbed [L.S.]." But as we just noted, the standard of review here is manifest weight—not sufficiency of the evidence. When reviewing a claim that a verdict is against the manifest weight of the evidence, the appellate court must weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether the fact-finder clearly lost its way in resolving evidentiary conflicts so as to create such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *State v. Thompkins,* 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). We do not view the evidence in a light most favorable to the state. "Instead, we sit as a 'thirteenth juror' and scrutinize 'the factfinder's resolution of the conflicting testimony.'" *State v. Robinson,* 6th Dist. Lucas No. L–10–1369, 2012–Ohio–6068, ¶ 15, citing *Thompkins* at 388. Reversal on manifest weight grounds is reserved for "the exceptional case in which the evidence weighs heavily against the conviction."

18.

*Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

{¶ 50} Although under a manifest-weight standard we consider the credibility of witnesses, we must nonetheless extend special deference to the fact-finder's credibility determinations given that it is the finder of fact who has the benefit of seeing the witnesses testify, observing their facial expressions and body language, hearing their voice inflections, and discerning qualities such as hesitancy, equivocation, and candor. *State v. Fell*, 6th Dist. Lucas No. L-10-1162, 2012-Ohio-616, ¶ 14.

## C. Analysis of the Parties' Arguments

{¶ 51} As an initial matter, we question whether Tuggle satisfied her initial burden of production here. Tuggle testified that she was holding the knife through the door, she and L.S. were "tugging over the door," and "he got stabbed" when he "charg[ed] to the door." She said that she knew that something was wrong only because L.S. stopped tugging at the door. Tuggle denied during her interview that she "physically stab[bed]" L.S., suggesting that it was an accident and was unintentional. Ohio courts have recognized that "[a]ccident and self-defense are generally inconsistent by definition, as self-defense presumes intentional, willful use of force to repel force or escape force, while accident is exactly the contrary, wholly unintentional and unwillful." (Internal quotations and citations omitted." *State v. Guice*, No. 18AP-305, 2019-Ohio-1324, 133 N.E.3d 874, f.n.3 (10th Dist.). To the extent that Tuggle claims that she did not

19.

"physically stab" L.S.—that he charged into the knife that she was holding—it would seem to us inconsistent for her to claim that she stabbed him while defending herself.

{¶ 52} However, the trial court's order of November 7, 2022, finds that the state proved beyond a reasonable doubt that Tuggle did not act in self-defense, implying that the court found that Tuggle met her initial burden of production. Moreover, the state does not claim that Tuggle failed in her initial burden. We will, therefore, review the trial court's conclusion that the state satisfied its burden and proved beyond a reasonable doubt that Tuggle did not act in self-defense.

{¶ 53} Tuggle used deadly force here. To disprove that she acted in self-defense, the state was required to convince the fact-finder that she (1) was at fault in creating the situation giving rise to the affray; (2) did not have a bona fide belief that she was in imminent danger of death or great bodily harm and that her only means of escape from such danger was in the use of such force; or (3) violated a duty to retreat or avoid the danger. As mentioned previously, the parties do not dispute that Tuggle had no duty to retreat. They, therefore, focus on the first two elements of a self-defense claim.

{¶ 54} Tuggle insists that she did not create the situation giving rise to the affray. She maintains that L.S. obtained the knife and took it into the bathroom with him, and once he and Tuggle started arguing through the bathroom door "it was [L.S.], knife in hand, that confronted Tuggle." Tuggle also claims that she had a bona fide belief that she was in imminent danger of death or great bodily harm and the use of deadly force was her only means of escape. She says that "it is undisputed" that an "aggressive, violent, and

20.

extremely brief" struggle ensued when *L.S.,* armed with a knife, confronted *her.* Tuggle claims that she wrestled the knife away from L.S. while they both struggled to control the bathroom door. She contends that L.S. charged her and she merely reacted. She maintains that there was no evidence undermining her claim of self-defense and that "the undisputed evidence that [L.S.] had the knife when the struggle began prevents reasonable minds from reaching the conclusion reached by the trier of fact."

{¶ 55} The state responds that it produced strong, credible evidence that Tuggle did not act in self-defense when she fatally stabbed L.S. It contends that Tuggle was at fault in creating the affray, as evidenced by the fact that L.S. retreated to the bathroom to get away from her. While it acknowledges that L.S. brought the knife into the bathroom, it emphasizes that he did so in order to lock the defective bathroom door. It points out that damage to the door shows that Tuggle desperately tried to get into the bathroom, and it was she who escalated the confrontation. The state posits that Tuggle's claim—that L.S. charged at her after she opened the bathroom door and she had no choice but to fatally stab him—made no sense "because if she successfully took the knife from him at the door and was successful in disarming the victim, at that point there was no need for the use of deadly force" because she could have used the weapon to keep him at bay. The state emphasizes that L.S.'s multiple stab wounds demonstrate that Tuggle was the aggressor.

{¶ 56} The state also argues that Tuggle did not have a bona fide belief that she was in imminent danger of death or great bodily harm as evidenced by the fact that in the

first 40 minutes of her recorded interview, Tuggle never stated that she was fearful of L.S. and never claimed self-defense until Detective Mooney suggested it as part of an interview technique. It emphasizes that during the 9-1-1 call, Tuggle did not assert self-defense or state that it was a "him or me" situation, and actually refused to answer when the 9-1-1 operator asked who stabbed the victim.

{¶ 57} Although it acknowledges that Tuggle had no duty to retreat, the state maintains that Tuggle used an excessive and unreasonable amount of force as evidenced by the fact that the victim had multiple slices and stab wounds. It points out that Tuggle weighs 258 pounds while the victim weighed only 190 pounds, therefore, she had a significant advantage over L.S. in a physical altercation. And it suggests that after allegedly disarming the victim, there was non-aggressive action she could have taken such as going downstairs, locking herself in a bedroom, or calling police to report a claimed attempted assault. The state theorizes that L.S. tried to lock himself in the bathroom to avoid a confrontation with Tuggle, but Tuggle pounded on the door so hard that she left holes in the door. The state insists that once the victim was disarmed, deadly force was no longer necessary.

{¶ 58} Finally, the state argues that "Tuggle's testimony was neither believable nor credible" because she told numerous lies, including (1) falsely telling the 9-1-1 operator that the victim fell on the knife; (2) falsely telling police officers at the scene that the victim committed suicide; (3) during her police interview, providing three different versions of how the stabbing occurred; and (4) denying at trial that she pounded

22.

on the door to get into the bathroom, even though she told responding officers otherwise. The state also maintains that Tuggle falsely testified that she had called police about other claimed instances of domestic abuse, falsely reported to police in November of 2021 that the victim had robbed her, falsely told investigating officers in 2021, that she and the victim never lived together, and lied about the victim's medications.

{¶ 59} To disprove self-defense, all the state had to do here was convince the trier of fact either that Tuggle was at fault in creating the situation giving rise to the affray or that she did not have a bona fide belief that she was in imminent danger of death or great bodily harm and that her only means of escape from such danger was in the use of such force. *See State v. Gibson*, 1st Dist. Hamilton No. C-220283, 2023-Ohio-1640, ¶ 12 ("The state need only disprove one of the elements of self-defense beyond a reasonable doubt." (Internal quotations and citations omitted.)). Again, Tuggle's self-defense claim would fail if the state disproved either element.

{¶ 60} As to whether Tuggle was at fault for creating the situation that gave rise to the affray, there was evidence that L.S. was trying to lock himself in the bathroom and keep Tuggle out. Eycke testified that there was damage to the exterior of the door, suggesting that Tuggle was trying to force herself into the bathroom, and the lock on the door was engaged, suggesting that L.S. was trying to keep Tuggle out. Eycke described that there was blood only on the outside of the door, but not on the inside, and the pattern of the blood suggested that the bathroom door was open when L.S. was stabbed, undermining Tuggle's claim that she stabbed him through the door as she and L.S.

23.

pushed and pulled in opposite directions. Additionally, the multiple stab wounds on the victim—his forehead, his arm, his chest—were inconsistent with Tuggle's claim that she held her arm extended through the door, with the knife in hand, and L.S. charged into it.

{¶ 61} As to whether Tuggle had a bona fide belief that she was in imminent danger of death or great bodily harm and that her only means of escape from such danger was in the use of such force, courts recognize that the bona-fide belief element is a combined subjective and objective test. *State v. Lane*, 6th Dist. Erie No. E-22-035, 2023-Ohio-1305, ¶ 24, citing *State v. Thomas,* 77 Ohio St.3d 323, 330, 673 N.E.2d 1339 (1997). It requires consideration of the force that was used in relation to the danger the accused believed he or she was in. *Id.,* citing *State v. Barker,* 2022-Ohio-3756, 199 N.E.3d 626, ¶ 28 (2d Dist.)*, appeal not allowed,* 169 Ohio St.3d 1431, 2023-Ohio-381, 202 N.E.3d 721. A person may use only such force as is reasonably necessary to repel an attack. *Id.* In both deadly and non-deadly force cases, "[i]f the force used was so disproportionate that it shows a purpose to injure, self-defense is unavailable." (Citations omitted.) *Id.* at ¶ 27.

{¶ 62} Many of the same facts evidencing that Tuggle was responsible for creating the situation that gave rise to the affray also belie Tuggle's claim that she had a bona fide belief that she was in danger of death or great bodily harm. For instance, if the trier of fact believed that L.S. locked himself in the bathroom in an attempt to keep Tuggle out—which is what Tuggle said during her recorded interview ("[L.S.] really was like trying to lock me out of the bathroom.")—it would follow that she did not believe that she was in

24.

danger of death or great bodily harm. In fact, at her recorded interview, Tuggle denied that L.S. was waving the knife around at her. She said, "[h]e never waved no knife at me or none of that." She conceded that "[she] threatened him so he threatened [her] back," but she said that "[she didn't] think he would threaten [her] with a knife." Even toward the end of the interview, Tuggle denied stabbing L.S. ("I didn't physically stab him though.") She said "[she didn't] know if he fell into it." These statements all call into question that Tuggle believed that L.S. would harm her. Moreover, the state repeatedly emphasized the absence of evidence in the 9-1-1 call indicating that L.S. had attacked Tuggle or that she feared for her safety.

{¶ 63} "A self-defense claim is generally an issue of credibility." *State v. Olsen,* 11th Dist. Ashtabula No. 2022-A-0071, 2023-Ohio-2254, ¶ 57, citing *State v. Walker*, 8th Dist. Cuyahoga No. 109328, 2021-Ohio-2037, ¶ 13. "'A fact finder is free to believe all, some, or none of the testimony of each witness appearing before it.'" *Id.,* quoting *State v. Fetty*, 11th Dist. Portage No. 2011-P-0091, 2012-Ohio-6127, ¶ 58. Even where a person asserting self-defense asserts "'uncontroverted' trial testimony" in support of his or her defense, the trier of fact is still free to accept or reject his or her version of events. *Id.* (concluding that where appellant's credibility was reasonably questionable, the jury did not clearly lose its way in rejecting his version of events).

{¶ 64} To that end, "[i]t is well settled that a conviction is not against the manifest weight of the evidence simply because the [trier of fact] rejected the defendant's version of the facts and believed the testimony presented by the state." (Internal quotations and

citations omitted.)  *State v. Hughkeith*, 2023-Ohio-1217, 212 N.E.3d 1147, ¶ 58 (8th Dist.), *appeal not allowed,* 170 Ohio St.3d 1518, 2023-Ohio-2771, 214 N.E.3d 591. "When there is more than one believable interpretation of the evidence, we do not choose which theory we believe is more credible and substitute it for the theory chosen by the [fact-finder]."  (Internal quotations and citations omitted.)  *State v. Rydarowicz*, 2023-Ohio-916, 210 N.E.3d 1133, ¶ 81 (7th Dist.).

{¶ 65} Here, Tuggle offered several implausible explanations for how L.S. suffered the fatal stab wound to his chest, failed to adequately explain how he suffered the other two non-fatal stab wounds, and changed her story multiple times.  These facts certainly could have led the trial court to find Tuggle not credible and to reject her version of the facts.  *See Olsen*, 11th Dist. Ashtabula No. 2022-A-0071, 2023-Ohio-2254, at ¶ 58 (rejecting manifest-weight challenge to self-defense claim where the only eyewitness to testify was appellant, who had "changed his story on more than one occasion").  Additionally, Eycke's description concerning her observations of the crime scene provided strong support for the state's version of events.  Under these facts, we cannot say that the trial court clearly lost its way in resolving evidentiary conflicts so as to create such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.

{¶ 66} Accordingly, we find Tuggle's sole assignment of error not well-taken.

26.

### III.  Conclusion

{¶ 67} The trial court's credibility determinations concerning Tuggle's claim of self-defense did not produce a verdict that was against the manifest weight of the evidence.  We find Tuggle's assignment of error not well-taken and affirm the November 23, 2022 judgment of the Lucas County Court of Common Pleas.  Tuggle is ordered to pay the costs of this appeal under App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Christine E. Mayle, J.            _____

                                                      JUDGE

Gene A. Zmuda, J.              

                              _____

Charles E. Sulek, J.                                 JUDGE
CONCUR.

                              _____

                                                      JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions.  Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.