**[Cite as *State v. Links*, 2025-Ohio-264.]**

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

State of Ohio

      Appellee

v.

Adam Links

      Appellant

Court of Appeals No. L-23-1226

Trial Court No. CR0202202610

**<u>DECISION AND JUDGMENT</u>**

Decided: January 24, 2025

* * * * *

Julia R. Bates, Lucas County Prosecuting Attorney, and
Randy L. Meyer, Assistant Prosecuting Attorney, for appellee.

Lawrence A. Gold, for appellant.

* * * * *

**OSOWIK, J.**

{¶ 1} This is an appeal of an August 24, 2023 judgment of the Lucas County Court of Common Pleas, convicting appellant, following a jury trial, on one count of aggravated murder, in violation of R.C. 2903.01, an unclassified felony, one count of aggravated robbery, in violation of R.C. 2911.01, a felony of the first degree, one count of murder, in violation of R.C. 2903.02, an unclassified felony, one count of felonious assault, in violation of R.C. 2903.11, a felony of the second degree, and one count of abuse of a

corpse, in violation of R.C. 2927.01, a felony of the fifth degree. Counts one through four each had accompanying firearm specifications.

{¶ 2} On September 1, 2023, the trial court sentenced appellant on count one to a term of incarceration of life imprisonment, with eligibility for parole after 25 years. Counts two through four were merged into count one for sentencing purposes. On count five, appellant was sentenced to a one-year term of incarceration, ordered to be served consecutively. For the reasons set forth below, this court affirms the judgment of the trial court.

{¶ 3} Appellant, Adam Links, sets forth the following sole assignment of error:

{¶ 4} "The jury's verdict was against the manifest weight of the evidence presented at trial."

{¶ 5} The following undisputed facts are relevant to this appeal. Appellant and the victim were friends prior to this incident. The victim was regularly invited to appellant's home to socialize. Pursuant to the established practice between the two, the victim would enter appellant's home without knocking. At the time of the events underlying this case, appellant had been unemployed for a lengthy period of time and was under financial strain.

{¶ 6} While appellant declined to testify at trial, appellant acknowledged during police interviews in the course of the investigation that he had telephoned the victim several hours before the incident, inviting him to come over to his home. Appellant later claimed that he subsequently changed his mind, contacted the victim again, and advised

2.

him not to come over. The record contains no evidence demonstrative of appellant's claim of rescinding the invitation.

{¶ 7} During the early morning hours of September 10, 2022, several hours after appellant's invitation, the victim went to appellant's home. Consistent with past practice, the victim let himself into appellant's home and went into the kitchen. The kitchen light was on.

{¶ 8} Upon the victim's arrival, appellant, who was upstairs in a bedroom, armed with his Zastava 39mm pistol, walked down the stairway, through the living room, and into the lit kitchen where the victim was standing and talking on his mobile phone. Appellant shot the victim several times from a distance determined to be no more than 4 feet away, killing him. Appellant, who acknowledges being a friend of the victim and inviting him over earlier that evening, nevertheless claims to have not recognized the victim until after shooting him. Despite claiming during the investigation that the shooting was a mistaken shooting of a possible intruder, appellant's systematic series of actions after the shooting reflect otherwise.

{¶ 9} The record shows that after the shooting, appellant made no calls for emergency medical assistance for the victim and made no efforts to assist the victim in any way. The friend of the victim, who was talking with the victim on their mobile phones at the time of the shooting, testified at trial that, while on the phone with the victim, the victim exclaimed, "[C]all 9-1-1, he just shot me," then he next heard the victim plead, "Please don't kill me, please don't kill me, just don't kill me man."

3.

Appellant's claim that he did not recognize his friend, who was standing next to him pleading for his life, prior to shooting him twice, is countermanded by the evidence.

{¶ 10} Appellant's rationale offered to the investigating officers for not seeking or providing any assistance to the victim varied during the investigation. It ranged from not wanting the incident "to spoil" his son's birthday party, scheduled at the home on the following day, to not wanting his ex-wife to learn of the incident.

{¶ 11} Rather than seek assistance for the victim after shooting him, the record shows that appellant removed and stole victim's the Rolex watch, wallet, ring, necklace, and $140.00 in cash from his body as it lay on the floor of the kitchen. Appellant then placed a plastic bag over the victim's head, set up a power circular saw and a hack saw, and partially dismembered the body. Appellant then put the remains into a snowblower box, concealed the box under a blue tarp, and placed blankets and additional boxes on top of the boxed remains. Appellant then cleaned up the victim's blood from the crime scene, hid the circular saw and hack saw in an upstairs bedroom closet, discarded the victim's mobile phones off-site, and showered.

{¶ 12} The victim's friend who had been on the phone with the victim at the time of the shooting had immediately contacted the police and reported the incident. The friend was unsure of the exact location of the shooting. Accordingly, the police attempted to pinpoint the location of the shooting by pinging the victim's several mobile phones, but appellant had discarded the victim's mobile phones in several different locations in

4.

appellant's neighborhood, making the determination of an exact location difficult. Later that night, the victim's car was located, parked in close proximity to appellant's home.

{¶ 13} Given this discovery, the investigating officers began knocking on the doors of the nearby homes, asking residents if they knew the victim or had any information regarding his whereabouts. Upon knocking on appellant's door, appellant answered the door and falsely claimed that he did not know or have any information about the victim, a longtime friend, and falsely suggested that the victim's car, which was parked on the street outside of appellant's home, must belong to a construction worker who had been working in the neighborhood.

{¶ 14} Later that day, appellant's next-door neighbor located the victim's mobile phone in his backyard, observed that appellant had backed up his car onto his rear patio and right up to his back door, and noted that the trunk was opened and lined with plastic tarps. This information was reported to the police. In the interim, one of the victim's other friends, suspecting that appellant was responsible for the victim's disappearance, called appellant, urged him to turn himself into the police, and advised him of possible adverse consequences in failing to do so. Shortly thereafter, appellant called 9-1-1 and reported that he had shot and killed the victim inside his home.

{¶ 15} Upon their return to appellant's home, appellant took the investigating officers inside and showed them the location of the victim's concealed remains. When explaining to the police why he had denied knowing the victim and had discarded the victim's mobile phones after the incident, appellant replied, "I wanted to have a plan."

5.

The police recovered the circular saw and hacksaw used by appellant in the partial dismemberment of the victim from appellant's upstairs closet during their search of the home. The officers noted that the home was devoid of any evidence of forced entry.

{¶ 16} On September 20, 2022, appellant was indicted on one count of aggravated murder, in violation of R.C. 2903.01, an unclassified felony, one count of aggravated robbery, in violation of R.C. 2911.01, a felony of the first degree, one count of murder, in violation of R.C. 2903.02, an unclassified felony, one count of felonious assault, in violation of R.C. 2903.11, a felony of the second degree, and one count of abuse of a corpse, in violation of R.C. 2927.01, a felony of the fifth degree.

{¶ 17} On August 21, 2023, a jury trial commenced. Appellant declined to testify at trial. Multiple friends of the parties testified at trial that the two were friends and were known to get together regularly at appellant's home to consume cocaine and alcohol. At the conclusion of the trial, jury instructions included self-defense and consciousness of guilt instructions. Regarding consciousness of guilt, given the series of appellant's post-shooting actions, the jury was instructed, in relevant part, "[I]f you find that the facts support the defendant was engaged in such conduct and if you decide the defendant was motivated by consciousness of guilt, you may, but you are not required to, consider that evidence in deciding whether the defendant is guilty of any of the charges that he has been indicted for. You alone will determine what weight, if any, to give this evidence."

6.

{¶ 18} Following deliberations, appellant was convicted on all counts and sentenced to a term of incarceration of life imprisonment, with possible eligibility for parole after 25 years, along with a consecutive one-year term of incarceration on the abuse of a corpse conviction, and accompanying firearm specifications. This appeal ensued.

{¶ 19} In the sole assignment of error, appellant argues that the convictions were against the manifest weight of the evidence. In principal support, appellant claims that appellee did not satisfy its burden of persuasion to disprove appellant's self-defense claim. We do not concur.

{¶ 20} As held by this court in *State v. Hardin*, 2024-Ohio-2943, ¶ 22 (6th Dist.),

> When determining whether a conviction is against the manifest weight of the evidence, the appellate court must review the record, weigh the evidence and all reasonable inferences drawn from the evidence, consider the credibility of the witnesses and decide, in resolving any conflicts in the evidence, whether the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *State v. Prescott*, 190 Ohio App.3d 702, 2010-Ohio-6048, 943 N.E.2d 1092, ¶ 48 (6th Dist.), citing *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). Fundamental to the analysis is that judgments supported by some competent, credible evidence going to the essential elements of the case will not be reversed by a reviewing court as being against the manifest weight of the evidence. *State v. Gist*, 6th Dist. Lucas No. L-12-1335, 2014-Ohio-3274, ¶ 26, citing *C.E. Morris Co. v. Foley Constr. Co.*, 54 Ohio St.2d 279, 376 N.E.2d 578 (1978), syllabus * * * The Supreme Court of Ohio has stated that the term sufficiency of the evidence presents a question of law as to whether the evidence is legally adequate to support a jury verdict as to all elements of the crime. *State v. Thompkins*, 78 Ohio St.2d 380, 386, 687 N.E.2d 541 (1997). In reviewing a sufficiency of the evidence claim, the relevant inquiry is whether, after reviewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime

7.

proven beyond a reasonable doubt. *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus.

{¶ 21} In conjunction with the above, given this appeal's foundation in disputing appellee's satisfaction of the burden of persuasion in rebutting appellant's self-defense claim, maintaining that appellant thought the victim was an intruder prior to the shooting, we are guided by a recent decision of this court likewise examining a claim of self-defense in response to a fatal shooting.

{¶ 22} In *State v. Carter*, 2024-Ohio-5031, ¶ 45-50 (6th Dist.), this court laid out the guiding legal framework as follows,

> Self-defense is an affirmative defense-- not an element of a crime. *State v. Greer*, 2023-Ohio-103, ¶ 33 (6th Dist.), citing *State v. Messenger*, 2022-Ohio-4562, ¶ 24. Although the burden to establish an affirmative defense typically remains with the defendant, R.C. 2901.05(B)(1) created a burden-shifting framework for self-defense. *Messenger* at ¶ 25. The defendant bears the initial burden to present some evidence, if believed by the jury, that would establish the defendant intentionally used force to repel force or escape force. *State v. Wilson*, 2024-Ohio-776, ¶ 18, 25. *Once the defendant presents any evidence that tends to support that [he or she] used the force in self-defense, the state must prove beyond a reasonable doubt that the accused person did not use the force in self-defense. State v. Lane, 2023-Ohio-1305, ¶ 16 (6th Dist.), quoting R.C. 2901.05(B)(1). Accordingly, the defendant bears the initial burden of production, and then the state bears the burden of persuasion. Id.*
> *On appeal, a manifest weight of the evidence standard of review applies to the state's burden of persuasion. Messenger at ¶ 26.* Under a manifest-weight standard of review, the court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether, in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *State v. Lang*, 2011-Ohio-4215, ¶ 220, quoting *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997). The discretionary power to grant a new trial should be

8.

exercised only in the exceptional case in which the evidence weighs heavily against the conviction. *Id.*, quoting *Thompkins* at 387.

*A claim of self-defense using deadly force involves three elements. Lane at ¶ 15, citing Messenger at ¶ 14. A person may use deadly force in self-defense where he (1) was not at fault in creating the situation giving rise to the affray; (2) had a bona fide belief that he was in imminent danger of death or great bodily harm and that his only means of escape from such danger was in the use of such force; and (3) did not violate any duty to retreat or avoid the danger. Id. To overcome a defendant's claim of self-defense, the state need only disprove one element beyond a reasonable doubt. Maumee v. Yeager, 2024-Ohio-858, ¶ 97 (6th Dist.).* Here, the state conceded that Carter had no duty retreat, so only the first two elements of self-defense were at issue at trial.

The second element of self-defense, that the defendant had a bona fide belief that he was in imminent danger of death or great bodily harm and that his only means of escape from such danger was in the use of such force, involves both the subjective and objective test. *State v. Lathan*, 2024-Ohio-2514, ¶ 77 (6th Dist.), quoting *State v. Thomas*, 77 Ohio St.3d 323, 330 (1997). *The factfinder must consider the bona fides of defendant's belief, and reasonableness therefore, and whether, under the circumstances, he exercised a careful and proper use of his own faculties. State v. Stevenson, 2018-Ohio-5140, ¶ 42 (10th Dist.), quoting State v. Sheets, 115 Ohio St. 308, 310 (1926). Accordingly, the second element of self-defense generally requires the trier of fact to evaluate the defendant's credibility. State v. Olsen, 2023-Ohio-2254, ¶ 57 (11th Dist.), citing State v. Walker, 2021-Ohio-2037, ¶ 13 (8th Dist.).*

An appellate court must extend special deference to the fact-finder's credibility determinations given that it is the finder of fact who has the benefit of seeing the witnesses testify, observing their facial expressions and body language, hearing their voice inflections, and discerning qualities such as hesitancy, equivocation, and candor. *State v. Fell*, 2012-Ohio-616, ¶ 14 (6th Dist.). *As such, a conviction is not against the manifest weight of the evidence because the trier of fact believed the state's version of events over the defendant's version and rejected the defendant's claim of self-defense. State v. Lawler, 2023-Ohio-3933, ¶ 33 (5th Dist.), quoting State v. Bentley, 2023-Ohio-1792, ¶ 24 (11th Dist.). See also State v. Walker*, 2021-Ohio-3860, ¶ 73 (6th Dist.), quoting *Thompkins* at 386. Indeed, even where a person asserting self-defense asserts uncontroverted trial testimony in support of his or her self-defense, the trier of fact is still free to accept or reject his or her version of events. *State v. Tuggle*, 2023-Ohio-3965, ¶ 63 (6th Dist.), quoting *State v. Olsen*, 2023-Ohio-2254, ¶ 57 (11th Dist.).

*Here, the jury could have found that [appellant's] actions were objectively unreasonable and his testimony regarding his subjective fear lacked credibility*. [Appellant] admitted that he never saw J.H. with a weapon. At most, therefore, J.H. tailgated [appellant] and then reversed his vehicle with his window down while pointing and smiling at [appellant]. [Appellant], in response, shot at J.H. eight times, fled the scene, and disposed of his weapon."
(Emphasis added).

{¶ 23} In applying this governing legal framework for appellate review of self-defense claims, as thoroughly elaborated in *Carter*, to the instant case, we likewise find that this case centers upon consideration of the second self-defense element, whether appellant had a bona fide belief that he was in imminent danger of death or great bodily harm and that his only means of escape from such danger was in the use of such force.

{¶ 24} The record shows that appellant and the victim had an established friendship, and that in the course of that friendship appellant routinely invited the victim to come to appellant's home to socialize, and that the mutually accepted protocol was that the victim need not knock on appellant's door prior to entering his home. The record further shows, and as acknowledged by appellant, that appellant had invited the victim to come to his home several hours before the victim did so, and was then fatally shot by appellant.

{¶ 25} In conjunction, the record shows that appellant was experiencing long-term unemployment and financial difficulties at the time of this incident. The record shows that appellant's subsequent claim that he later notified appellant that he no longer wanted him to come to his home that night is devoid of evidentiary support. The record shows

that appellant's claim that upon hearing a voice downstairs, coming downstairs with a loaded firearm, walking into a lit kitchen where his friend was talking on his mobile phone, he did not recognize that the person standing and talking no more than four feet away was the friend who he had earlier invited over until only after shooting him twice, is overwhelmingly rebutted by the relationship between the parties, the invitation by appellant to the victim several hours earlier, the established protocol that the victim could enter the home without knocking, and the undisputed conditions of the shooting, from no more than four feet away in a lit room while the victim was talking on his mobile phone. Assertions that appellant perceived the victim to be an unknown intruder and that he was in imminent danger of death or great bodily harm and that his only means of escape was in the use of such force are unreasonable and refuted by the facts and circumstances of this case.

{¶ 26} Further, appellant's systematic series of actions immediately following the shooting all run counter to his self-defense claim. Upon shooting the victim several times from no more than four feet away, and ostensibly only then recognizing his friend as the shooting victim, appellant declined to call 9-1-1 for help, declined to take the victim to the hospital, and declined to take any actions whatsoever to assist the victim.

{¶ 27} On the contrary, immediately after the shooting, appellant removed and stole the victim's Rolex watch, wallet, ring, necklace, and $140.00 in cash. Appellant then placed a plastic bag over the victim's head, partially dismembered the victim's body, boxed and concealed the remains, concealed the circular saw and hack saw, disposed of

11.

the victim's mobile phones off-site, and then denied to the investigating officers who came to his front door that he was acquainted with the victim or had any knowledge regarding the victim's whereabouts. After the investigating officers left his residence, appellant backed up his vehicle onto his patio up to his rear door, opened his trunk, and lined the trunk with plastic tarps. Appellant did not testify at trial.

{¶ 28} The record of evidence shows that appellant's claim that he had a bona fide belief that he was in imminent danger of death or great bodily harm and that his only means of escape was in the use of such force under the facts and circumstances of this case is devoid of evidentiary support.

{¶ 29} Accordingly, we find that the record encompasses ample evidence from which the jury could have found that appellant's self-defense claim lacked credibility and that his use of fatal force in response to the victim's presence in his home was objectively unreasonable. Thus, because the jury had clear evidence upon which to find that the state carried its burden of persuasion on the second element of self-defense, we need not address the first element.

{¶ 30} We find that this is not an exceptional case in which the jury clearly lost its way and the evidence weighs heavily against appellant's conviction such that the conviction caused a manifest miscarriage of justice. Wherefore, we find appellant's assignment of error not well-taken.

12.

**{¶ 31}** On consideration whereof, the judgment of the Lucas County Court of Common Pleas is hereby affirmed. Appellant is ordered to pay the costs of this appeal pursuant to App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Thomas J. Osowik, J.                                    _____
                                                                                    JUDGE

Gene A. Zmuda, J.

                                                                     _____
Myron C. Duhart, J.                                                        JUDGE
CONCUR.

                                                                     _____
                                                                                    JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.