[Cite as *State v. Hernandez*, 2026-Ohio-679.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

State of Ohio

      Appellee

v.

Antonio Hernandez, Jr.

      Appellant

Court of Appeals No.  {48}L-24-1232

Trial Court No.  CR0202302553

**DECISION AND JUDGMENT**

Decided: February 27, 2026

* * * * *

Julia R. Bates, Lucas County Prosecuting Attorney, and,
Randy L. Meyer, Assistant Prosecuting Attorney, for appellee.

Ronnie L. Wingate, for appellant.

* * * * *

**MAYLE, J.**

{¶ 1} Appellant, Antonio Hernandez Jr., appeals the August 30, 2024 judgment of

the Lucas County Court of Common Pleas sentencing him to 18 years to life in prison.

For the following reasons, we affirm.

**I. Background and Facts**

{¶ 2} This case arose from a December 18, 2022 shooting at a trailer on Moss

Creek in Washington Township, Lucas County, Ohio.  After being bound over from the

juvenile court, Hernandez (who was 17 years old at the time) was charged with one count

each of murder in violation of R.C. 2903.02(A), an unclassified felony (count 1); murder in violation of R.C. 2903.02(B), an unclassified felony (count 2); and felonious assault in violation of R.C. 2903.11(A)(2), a second-degree felony (count 3). Each charge carried a three-year firearm specification under R.C. 2941.145(A).

{¶ 3} Hernandez's case was tried to a jury. At trial, the State presented the testimony of 18 witnesses. Hernandez testified in his own behalf. The following evidence was adduced at trial.

### A. State's case

### 1. Mother's testimony

{¶ 4} Shawnta, the mother of victim K.C., testified that K.C. was 18 when she died. She was in an off-and-on relationship with Zoey at the time. She and Zoey had moved in together about 30 days before her death. Shawnta described K.C. as "quiet. She never really liked a crowd. She didn't do parties and gatherings."

{¶ 5} On cross-examination, Shawnta said that K.C. was in love with Zoey. Shawnta knew that Zoey was unfaithful to K.C., that they were about to break up, and that K.C. was coming home because of Zoey. She did not know who Zoey was being unfaithful with.

{¶ 6} On redirect, Shawnta explained that K.C. knew of Zoey's infidelity and never reacted violently to it. Instead, she said that "they had miscommunication and [K.C.] wants to leave and Zoey wants her to come back." K.C. would go back to Zoey after these incidents.

2.

## 2. Officers' testimony

{¶ 7} Lieutenant Phil Cook of the Toledo Police Department testified that he is responsible for retrieving 911 calls and call records. He presented the records of two 911 calls from the Moss Creek trailer.

{¶ 8} In the first call, an agitated female caller tells the operator that she needs an ambulance because her girlfriend was just shot. She did not know who shot her girlfriend. She tells the operator that the girlfriend has a bullet in her chest and is bleeding out. She repeatedly asks for an ambulance and paramedics and asks where help is.

{¶ 9} In the second call, a caller who identifies herself as Savannah tells the operator that a shooting happened at her house earlier and clothes belonging to Antonio Hernandez, the person who shot her sister's girlfriend, were still at her house. She said that he changed out of his clothes so they would not be able to give a description of the clothes that he was wearing.

{¶ 10} TPD officer Brandon Spinner was the first officer to arrive on the scene in response to the 911 call. When he first arrived, he scanned the area to see if the suspect was still on the scene but did not see anyone. Inside the trailer, he found approximately six people, including K.C. The people inside were "hysterical" and "loud" and some were crying. Spinner found K.C. in a bedroom between the bed and the wall. He did not see anything, including any weapons, in her hands or around her on the ground. When he pulled her out from between the bed and the wall, he could see her gunshot wound. He administered first aid to K.C. while he waited for paramedics to arrive. His primary

3.

concern when he first entered the residence was attending to K.C. He moved her so that he could render treatment.

{¶ 11} After the paramedics arrived, Spinner helped gather information on scene. He eventually rode to the hospital with K.C. in the ambulance and stayed at the hospital until officers from Washington Township arrived.

{¶ 12} On cross-examination, Spinner said that he arrived at the trailer approximately three minutes after receiving the dispatch. He could not remember what information he gathered from the witnesses. He recalled seeing a young woman who was "hysterical" and concerned about her girlfriend being shot but did not recall noticing any blood on her.

{¶ 13} TPD officer Michael Rickard testified that he and his partner, officer Daniel Radwanski, responded to a 911 call for a "shot person." They arrived after Spinner. When he got to the trailer, people inside directed him to the bedroom where K.C. was lying on the floor between the wall and the bed. He saw Spinner attempting to administer first aid and helped Spinner with his efforts. K.C. had a pulse while they waited for paramedics, and Rickard's primary concern was maintaining her condition until EMS arrived.

{¶ 14} Once EMS took over K.C.'s care, Rickard helped secure the scene, assisted with detaining witnesses, gathered information, and searched for evidence. He checked the walls for bullet holes and the floor around the bed for bullet fragments or other evidence, but he did not find anything. He did not see shell casings, a firearm, or a knife on or around K.C. or in the bedroom. A man on scene, later identified as Anthony

4.

Strunk, told Rickard that the suspect "was a black dude," but no one provided information about the suspect's whereabouts. As far as he heard, no one mentioned a knife. He characterized the trailer occupants' demeanors as upset and recalled that Savannah appeared upset and somewhat erratic.

{¶ 15} Rickard's body camera video footage from that night shows a frantic Zoey begging officers to help her girlfriend. When one of the officers asks where the gun is, Zoey responds, "I don't know. The gun's gone. The gun's gone. He ran off." When an officer asks her who ran off, she says, "I don't know who ran off." Then Strunk says, "It was a black man, bro." Zoey continues begging and screaming for help until Strunk physically removes her from the bedroom. After that, the video shows the officers rendering first aid to K.C. The officers note that they have no suspect information. After a couple of minutes, Rickard walks around the rest of the trailer. He eventually walks outside where other officers are talking to Savannah. She tells the officers that she was in the other bedroom with her baby trying to get him back to sleep when she heard a bang and then heard Zoey say that her girlfriend was shot. She claims that she did not know what happened from that point because she was in the second bedroom with the baby. When the officers ask if anyone who was there earlier is no longer present, she asks if "Tonio," the "Hispanic kid," is there. When the officers say that he is not, Savannah explains that she did not want Strunk to know that she told them because he might hurt her, but his name was Antonio Hernandez, and he was one of the people at the party.

{¶ 16} On cross, Rickard agreed that the residence was chaotic with multiple people present and talking, but he did not hear their stories and could not specify who

was there.  He confirmed that he did not see any shell casings at any point and did not recall seeing a knife on the kitchen island, though he later learned that a knife had been removed from the counter.  He did not recall personally seeing the knife and could not describe it but understood that Radwanski was the one who picked it up.  He did not know what Radwanski did with the knife but believed standard procedure would be to turn it over to Washington Township, the investigating agency.

{¶ 17} Rickard did not recall seeing red clothing under K.C.'s body.  He was not aware of anyone claiming that a shot came from outside the trailer.

{¶ 18} Radwanski testified that he and Rickard responded to a call for a person shot.  When he arrived at the trailer, he found multiple "highly emotional" people telling him that a person was shot in the bedroom.  When he entered the bedroom, he saw K.C. lying on the floor between the bed and the wall.  Spinner and Rickard were administering first aid.  When Radwanski asked one of the people in the trailer what the suspect looked like, he was told that they did not know.  He did not see any bullet holes or shell casings in the bedroom.

{¶ 19} On his body cam video, he described one man (later identified as Strunk) as defensive and argumentative.  He recalled interacting with Zoey, who had blood on her hands.

{¶ 20} At one point, another officer pointed out a partially opened knife on the kitchen counter.  Radwanski picked it up for officer safety.  He first moved it from the counter to the microwave and then to the top of the refrigerator to keep it out of reach. He received no information that the knife was involved in the incident and moved it only

6.

for safety reasons. He did not recall seeing blood on the knife, could not tell from a photo whether it had blood on it, and said blood would have been important to note, if it were present. Once Washington Township officers responded and took over, Radwanski left to respond to another scene. He did not recall speaking with WTPD detectives or know whether they were notified about the knife.

{¶ 21} The first minute of Radwanski's body camera video shows the same scene as the beginning of Rickard's body camera video. After Radwanski leaves the bedroom, an officer is heard saying that he has not gotten much suspect information "other than it's some random black guy that ran off." When Radwanski asks Strunk and Zoey if they have any description of the shooter, Strunk tells him that they do not. Blood is visible on Zoey's hands in the video. The video also shows the black, partially open knife on the counter and Radwanski grabbing and moving the knife. Later, as Strunk is handcuffed and sitting on the couch in the living room, he yells to Savannah to "don't say shit" and to "let these police find out the shit theyself [sic]."

{¶ 22} On cross, Radwanski confirmed that another officer told him to grab the knife, he picked it up using a rubber glove, and he placed it on the refrigerator for safety. The knife was partially open when he picked it up. He did not recall whether he closed it completely before placing it on the refrigerator. He did not believe the knife had evidentiary value because the dispatch information was only of a shooting. He did not know if the knife was tested for DNA and conceded that he did not know whether any blood was on it. He did not include anything about the knife in his report or personally inform WTPD about it.

7.

{¶ 23} Radwanski said that the scene was chaotic with at least three adults and a baby present. He agreed that Zoey was hysterical and Strunk uncooperative, and that officers attempted to calm Zoey without success. When Radwanski asked about a potential suspect, Zoey said, "he ran off," but when he asked who, responded "I don't know who ran off." Radwanski did not get a suspect description or clothing information from the trailer occupants during his time on scene. He heard someone say the shot might have been from outside, so the officers checked the exterior perimeter for bullet holes, but they found none.

{¶ 24} Radwanski confirmed that Strunk lifted and moved Zoey out of the officers' way and took her toward the kitchen where the knife was found.

{¶ 25} TPD officer Matthew Harger testified that he responded to the shooting incident on Moss Creek. When he arrived, he found a "chaotic" scene with lots of yelling and screaming. He recalled between six and eight non-law-enforcement people being in the trailer. He said their emotions were high and they were distraught and worried about K.C.

{¶ 26} While in the trailer, Harger saw a knife on the kitchen counter. He also saw that Zoey had blood on her hands. He did not see any blood on the knife or recall seeing any on the counter. No one mentioned the knife to any law enforcement officers during their investigation as being involved in the shooting. Harger did not find any shell casings or bullet defects in the trailer.

{¶ 27} Harger explained that not every item in a home would be taken as evidence. Items with evidentiary value are identified and collected by investigative

8.

personnel based on witness input, visible indicators like blood, and proximity to victims or suspects. In this case, the victim was located on the floor of a rear bedroom, while the knife was on the kitchen counter in a different room approximately 50 feet away. Therefore, he concluded that the knife had no apparent importance beyond officer and occupant safety.

{¶ 28} After leaving the trailer, Harger took Strunk to the Lucas County jail.

{¶ 29} In Harger's body camera video, he is in the kitchen with Savannah and Zoey. Savannah says, "I was just laying down my son. I don't know what's happening right now." Harger sees the knife on the counter and tells Radwanski to grab it. Harger spends some time looking around the trailer for bullet holes. Zoey and Strunk are yelling in the background of most of the video and the scene is fairly chaotic. Later, Strunk is sitting on the couch in the living room but is not yet in handcuffs. He yells, "Savannah! Don't fucking say nothing . . . ." After that, one of the other officers handcuffs Strunk. Harger's body camera also records Strunk telling Savannah to "don't say shit" and to "let these police find out the shit theyself [sic]." After that, Harger walks Strunk to his patrol car.

{¶ 30} On cross-examination, Harger confirmed that no one mentioned a knife to him at the scene. He did not recall anyone saying that the shot came from outside, though his body camera showed that he was among the officers searching around the door area for the bullet's origin or other evidence. He did not recall whether a black male was mentioned as a suspect.

9.

{¶ 31} Regarding the knife, he identified Radwanski as the officer who moved it—initially to the microwave and then to the fridge—at Harger's direction to get it "out of play" for safety. Harger only briefly viewed the knife, did not examine it for blood, DNA, or fingerprints, and did not know whether it was examined or taken as evidence. While responding to a shots-fired call, he was not specifically looking for a knife.

{¶ 32} Christopher Kaiser, chief of the WTPD, testified that he was called to a trailer neighboring the Moss Creek trailer because the resident, Derrick, had found a shell casing. Derrick found the casing on his driveway but had it in a plastic bag when Kaiser arrived. The casing was a .40 caliber casing. Kaiser said that the two trailers were approximately 40 feet apart and the casing was found approximately 30 feet from the Moss Creek trailer.

{¶ 33} After retrieving the casing, Kaiser took it to the station for processing.

{¶ 34} On cross, Kaiser confirmed that the casing was sent for testing, although he did not know exactly what tests were performed. He had no firsthand knowledge of how Derrick initially handled the casing before bagging it. He acknowledged that the casing was submitted for testing approximately two months after the incident.

### 3. Neighbor's testimony

{¶ 35} Derrick, the neighbor who found the shell casing, testified that he was aware that something happened at the Moss Creek trailer because he saw the police cars and ambulance. "[W]ithin a day or two" of seeing those vehicles at the neighbor's trailer, he found the shell casing in his driveway. He explained that he saw something shiny on the ground, picked it up, and "as soon as [he] realized what it was [he] dropped it." He

10.

then got a baggie, picked up the casing with the baggie, sealed the casing inside, and called the police. The police came to take the casing.

{¶ 36} On cross, Derrick confirmed that he was "[n]ot 100 percent sure when" the casing was put on his driveway but knew that it was "within a day or two of that incident."

### 4. Medical testimony

{¶ 37} Michael Bailey, chief of the Washington Township Fire Department, testified that he responded to the gunshot wound call. Upon entering the trailer, Bailey observed a "mildly chaotic" scene with yelling and screaming happening. Law enforcement officers were present, and people were separated in different rooms. He went directly into the bedroom where K.C. was lying on the floor. He noted that K.C. had a gunshot wound to her chest and did not have an exit wound on her back. After assessing K.C., the EMTs decided to immediately transport her to the hospital. She was awake and talking on the way to the hospital but coded as the EMTs transferred her to the hospital's care. He did not know K.C.'s time of death.

{¶ 38} On cross-examination, Bailey confirmed that he assessed K.C. and determined that she needed to be transported to the hospital. He recalled assisting with K.C. inside of the trailer but did not remember moving her outside and did not recall whether she was dropped while EMTs were moving her to the gurney.

{¶ 39} Dr. Dwayne Wolf, the deputy Lucas County coroner who performed the autopsy on K.C., testified that she had a gunshot wound to her torso and contusions on the right side of her neck and left wrist and hand. No other injuries were noted aside

11.

from medical intervention markings, like a surgical incision. There was no visible gunshot residue on K.C.'s hands. Her chest showed an atypical gunshot entrance wound complex, with a true entrance wound, a partial exit wound, and a re-entry wound in a skin fold. This presentation was due to breast compression, which could have come from the sports bra K.C. wore. Internally, the bullet traveled front to back, perforating the center of K.C.'s liver and inferior vena cava, eventually lodging in her 12th thoracic vertebra. The bullet's lead core was recovered from K.C.'s spine, and its jacket was found in her chest cavity. There was no soot or stippling on K.C.'s skin, and no gunshot residue on her clothing, which indicated that the gun was fired from a range of greater than two feet. Wolf certified K.C.'s cause of death as a gunshot wound to the torso and determined that her manner of death was homicide.

{¶ 40} On cross, Wolf said that the injuries on K.C.'s neck and wrist could be consistent with being in a fight. These injuries likely occurred around the time of her death. Wolf also said that the same type of atypical bullet wound could occur if a person was shot with their hands up. Wolf reiterated there was no soot or stippling on K.C.'s skin, indicating that the shot was from greater than two feet, but the precise distance was indeterminate. He clarified that wounds caused from beyond two feet appear the same, whether at three feet or much farther, and emphasized that "closeness" referred to gun-to-body distance.

### 5. Partygoers' testimony

{¶ 41} Shannon, a friend of Strunk's, testified that she went to the Moss Creek trailer the night of December 17, 2022, because Strunk and Savannah asked her to come

12.

over.  Strunk, Savannah, Hernandez, Zoey, K.C., and Strunk and Savannah's baby were there.  Shannon said that Hernandez had a gun and "was not what you would call very compliant with a weapon."  She did not see anyone else with any weapons.  Hernandez was also acting drunk and rowdy while swinging the gun around, which made Shannon very uncomfortable, particularly because there was a baby around.  She asked Hernandez to put the gun away, but he refused.  She described him as acting "hard" and "tough, like he's a big bad guy.  No matter what he does or do he's not worried about anybody."  Hernandez "made a comment that if they killed anybody they would get away with it."

{¶ 42} Zoey and K.C. were having fun when Shannon arrived.  They "didn't seem like anything was so serious between them at that time."  Although this was the first time Shannon had met K.C., she described her as "very sweet, loving, very quiet, seemed pretty laid back girl.  Wasn't rowdy at all being there.  Very personal."

{¶ 43} No one got into a fight while Shannon was there, but she felt "a little schemie [sic] in the room from like the three roommate relationship type thing that was going on between Zoey, Antonio, and [K.C.]."

{¶ 44} Shannon left the trailer to go to the store.  She denied going to buy liquor for the group, claiming that "they had a whole gallon of liquor on the table at the time when [she] arrived already."

{¶ 45} She eventually left because Hernandez was making her feel unsafe.

{¶ 46} On cross-examination, Shannon explained that she did not really know Hernandez.  When she went to the store, she took Savannah and either Strunk or Hernandez with her.  She bought alcohol for her personal consumption at the store; she

13.

did not buy it for the group at the trailer. Although Hernandez gave her money, she claimed that it was for gas, not alcohol.

{¶ 47} When Shannon left the trailer, she said that everything seemed normal. However, she felt some tension between Zoey, K.C., and Hernandez.

{¶ 48} Shannon was at the trailer for no more than an hour. She told the detective that she left because she felt uncomfortable due to the tension between Zoey, K.C., and Hernandez. She also said that she had a hit-and-run situation to deal with that night. She did not tell him that she was uncomfortable because of the gun.

{¶ 49} Shannon told the detective that the people at the party were not in any danger, but Hernandez took offense to her telling him that having a gun did not make him cool. She told the detective that the group was already drunk when she arrived.

{¶ 50} Zoey testified that K.C. was her girlfriend. They lived together at the Moss Creek trailer, along with Strunk, Savannah, and Strunk and Savannah's child. She described K.C. as "[v]ery kind and caring and funny and a very good person in general." She knew that Hernandez and Strunk were cousins and were also friends.

{¶ 51} The night of December 17, 2022, Zoey, Hernandez, Strunk, and Savannah were hanging out at the trailer drinking. Shannon was also present for part of the evening to take Hernandez to the store for more liquor. Hernandez and Strunk both had guns out that evening. Hernandez carried his in the waistband of his pants. Hernandez and Strunk got into a fight that evening, with Hernandez "choking Anthony out to the point where his face was turning purple[.]" Hernandez also got into a fight with Zoey because he was

14.

lying on the floor of the bedroom pointing his gun at her when she walked out of the bathroom. They bit each other during their fight.

{¶ 52} Later in the evening, right before K.C. was shot, Zoey was in the bedroom waiting to use the bathroom. She was lying on the right end of the bed while she waited. As she was waiting, Hernandez came in and stood by the foot of the bed near her. While they were both in the room, K.C. walked in. She did not have a knife or anything else in her hands. Zoey heard K.C. yell, and then Hernandez shot K.C. Zoey ran to her phone to call 911. She did not tell the police who shot K.C. because she was scared and "the retaliation is real." However, when she was at the police station being interviewed, she asked to call her mother after learning that K.C. had died and she told her mother that "Antonio did it."

{¶ 53} The first time Zoey learned about a knife being involved in this case was sometime after Hernandez or Strunk testified in juvenile court. She said that K.C. owned a pocketknife that she kept in a drawer in her and Zoey's bedroom in the trailer. When Zoey went to the trailer on December 18 to pack up K.C.'s belongings, she found the knife in their bedroom under a fan. She had never seen K.C. with a black and green knife.

{¶ 54} On cross, Zoey confirmed her testimony from a prior hearing that K.C. owned a small, two-inch, silver-bladed pocketknife, not a green and black knife. However, she later identified pictures of an eight-inch, black-bladed knife as the knife belonging to K.C. that she found in their bedroom. She agreed she had testified previously that there was no argument between Hernandez and Strunk at the party and no

altercation between Hernandez and K.C. other than the shooting. She admitted that she may not have reported Hernandez pointing the gun at her or choking Strunk to any law enforcement until she spoke with the prosecutor a few days before trial.

{¶ 55} Zoey admitted to being unfaithful to K.C. during their relationship by having sexual relations with Hernandez. The night of the shooting, while Zoey was sitting on the bed waiting to use the bathroom, Hernandez came in and stood near her by the foot of the bed. At an earlier hearing, Zoey testified that K.C. came in the room and did not like what she saw going on between Zoey and Hernandez, but she could not remember what she and Hernandez were doing. Whatever they were doing was consensual.

{¶ 56} She also admitted to telling police that she did not know who shot K.C. and did not know where the shot had come from. She did not recall telling officers that she was sitting on the couch or a stool and came running when the shot was fired but did not dispute those statements if they were on the officers' body cameras.

{¶ 57} Zoey said that Hernandez and K.C. "were good friends" and were near each other most of the night. She also confirmed that Shannon came to the trailer to take Hernandez to buy alcohol.

{¶ 58} On redirect, Zoey explained that she told the police on the scene different things than she said in court "[p]robably because [she] was really drunk" and she "just watched [her] girlfriend get murdered."

{¶ 59} She did not see any physical altercation between Hernandez and K.C. the night of the shooting. Although K.C. touched Hernandez, it was not in an aggressive

16.

way. Zoey heard K.C. yelling when she came into the bedroom but did not see a knife in her hand.

{¶ 60} Savannah testified that she was living at the Moss Creek trailer with Strunk, their child, Zoey, and K.C. in December 2022. The night of the shooting, the trailer's residents (with the exception of the baby) and Hernandez were smoking and drinking to the point that they became "pretty drunk." Hernandez brought liquor with him; when he ran out, Strunk called Shannon to come take Hernandez to the store for more. Savannah went to the store with Shannon and Hernandez.

{¶ 61} Savannah saw Hernandez with a gun in his pocket that evening. She thought it was a .40 caliber but did not know the brand.

{¶ 62} Regarding Hernandez and K.C.'s relationship, Savannah said that she did not "think that they hated each other. [She] thought they were like cool together. . . . Like there wasn't no problems."

{¶ 63} Savannah said that Hernandez and Strunk were both cousins and "like best friends." Despite that, they had gotten into a fight that evening and "Antonio had choked [Strunk] out till he like turned purple." Following the fight, Strunk went into the bathroom and passed out on the floor.

{¶ 64} While Strunk was in the bathroom, everyone else was in the kitchen. Then Zoey went into the bedroom. Hernandez also went into the bedroom. Soon after, the music that was playing stopped, so Savannah went to see what was going on. When she walked into the bedroom, she saw Zoey on the bed and Hernandez standing at the end of the bed. She did not remember what they were doing. She walked past them, took the

17.

baby out of his crib, and left the bedroom. When she got back to the kitchen, K.C. was sitting at the counter. She did not have anything in her hands and did not seem upset or angry. K.C. asked what Zoey was doing. Savannah responded, "I don't know what she's doing. Go check." She then took the baby into the other bedroom. As she was doing so, she passed K.C., who did not have anything in her hands. While Savannah was shutting the bedroom door, she "heard [K.C.] yell, Oh, so we fucking with these n-----. And Zoey said, no, baby. It's not like that. And then [she] heard the gunshot." Savannah did not see K.C. walk at or near Hernandez with a knife, and she did not have anything in her hands just before the shooting.

{¶ 65} After hearing the gunshot, Savannah heard Zoey screaming in the kitchen. She went out to Zoey, who did not have anything in her hands except her phone. She then went into the bedroom to check on K.C. Shortly after, the police arrived.

{¶ 66} When the police initially questioned Savannah, she did not give them Hernandez's name because she "didn't want to be like be labeled as a snitch[,]" "didn't know what really had went on in the first place anyways[,]" did not truly know who had shot K.C., and "didn't want to say the wrong thing in front of" Strunk because he could sometimes be violent. She recalled Strunk "telling [her] not to tell them nothing, like, don't tell them anything, when the cops were there." However, she eventually told the detective about Hernandez that night. She learned for sure that Hernandez had shot K.C. when Zoey called their mother from the police station. She learned from that same phone call that K.C. had died.

18.

{¶ 67} Savannah found Hernandez's clothes in the trailer and turned them over to the police.

{¶ 68} On cross-examination, Savannah claimed that she did not recognize the black knife in the photo defense counsel showed her and did not believe it was K.C.'s knife. She thought that it was a different knife than the knife she saw a police officer holding in the trailer.

{¶ 69} Savannah admitted that she did not tell the police the story about going into the bedroom to get the baby and K.C. asking her what Zoey was doing the night of the shooting. She did not add these details to her story until March 2024 after the prosecutor told her that she needed to speak to the police again. During the second interview with the police, Savannah told the officer that she was mad because Strunk was claiming that Hernandez acted in self-defense, but he was in the bathroom at the time of the shooting.

{¶ 70} She acknowledged telling the police the night of the shooting that she heard the baby crying, picked him up, was in the other bedroom with him watching TV, paused the show, heard a loud bang, and stayed still until she heard Zoey on the phone, but she testified at trial that those details were lies she told to avoid losing custody of the child and that she later told the truth. She also told the officers that someone fired a shot into the house.

{¶ 71} She testified that she had suspicions when Zoey and then Antonio went into Savannah's bedroom and the music stopped, given Zoey and Antonio's past, which led her to go check, but she does not remember exactly what she saw beyond Zoey on the

19.

bed and Antonio standing at the end of the bed, and she could not say whether they were having sex.

{¶ 72} Savannah admitted that she was not in the room with Hernandez and K.C. "[f]or like two minutes" before the shooting and could not see into the room. However, Savannah "walked past her, and it only took two minutes. There wasn't no knife accessible for her to just grab and come at him with a knife. She did not have nothing in her hands."

### 6. Detective's testimony

{¶ 73} Deputy chief detective Eric Hart of the WTPD was the lead investigator on this case. He testified that he responded to the scene of the shooting on December 18, 2022. When he arrived, he first assessed K.C., who was on the floor of the bedroom between the bed and the wall.

{¶ 74} Hart next went to the kitchen where Zoey, Savannah, and Strunk were. He described Zoey as extremely frantic and loud, Savannah as the calmest, and Strunk as loud and distracting. Strunk told Savannah not to say anything to the police. Zoey had blood on her hands and arms. No one else in the trailer had blood on their hands.

{¶ 75} Hart did not see a knife while he was on scene. He did not collect or photograph any knives until much later in the investigation, and none of the TPD officers on site told him anything about a knife.

{¶ 76} Hart did not initially receive any information about the suspect from the EMTs or the trailer's occupants. Later, he heard Strunk say that the shooter was "a random black guy." The first "verified suspect information" he got came from Savannah.

20.

He was speaking with her in the driveway and, after confirming that Hernandez was gone, she told him that Hernandez had been at the trailer, he had fled, and he had shot K.C. She also claimed that she had not said anything earlier out of fear.

{¶ 77} While speaking with Strunk on scene, Hart found him to be difficult, uncooperative, and agitated. He was eventually taken into custody.

{¶ 78} Hart learned from TPD officers who went to the hospital that K.C. had died. When he later went to the hospital, he collected the bullet jacket that doctors found in K.C.'s chest and the clothes that K.C. had been wearing, took photos, and notified the coroner.

{¶ 79} After completing his investigation at the hospital, Hart interviewed Zoey at the police station. Although Zoey had calmed down, when he informed her that K.C. had died, "that new news, again, escalated her situation, very upset, very dramatic situation." Zoey asked to call her mother, which the officers eventually allowed. While speaking to her mother, Zoey said, "Antonio Hernandez shot my girlfriend, and I watched him do it." This was the first time Zoey had provided any information about a suspect.

{¶ 80} Based on the information he had gathered, Hart obtained a warrant for Hernandez's arrest.

{¶ 81} At no point did Hart have any indication that there would be a self-defense claim in this case or that a knife would be important in this case. Later on in his investigation, he learned from the prosecutor's office that a knife had been given to K.C.'s mother. He collected the knife as evidence but did not have it tested because of his inability to place it at the scene.

21.

{¶ 82} Hart saw Hernandez just after his arrest. He did not have any cuts, scratches, or bruises on his hands or face.

{¶ 83} Hart said that the bullet jacket and bullet core appeared consistent with a .40 caliber bullet. The gun used to shoot K.C. was never recovered.

{¶ 84} Hart eventually interviewed Shannon. The interview took place a long time after the shooting because it took him a considerable amount of time to fully identify her.

{¶ 85} On cross, Hart said that Zoey told him at the police station that she was lying in bed waiting for K.C. to come out of the bathroom when she heard a boom, saw a bright light, and heard K.C. say "help," She called 911 as soon as she heard the boom. Zoey was also irate and kicking desks and trashcans.

{¶ 86} In his 16 years with WTPD, this was the only murder case he had investigated.

{¶ 87} Hart first received information about a knife on December 19, 2022, but did not search for a knife at that time and later realized from video—"way down the road"—that a knife had been on the counter and moved by an officer, by which time any evidentiary value would have been diminished. The knife was never sent for DNA testing, and he had no knife to test at the time of the initial investigation. He maintained that he could not say whether the knife he later recovered from K.C.'s mother was the same knife seen on the counter, despite it looking similar in photos he took when he recovered it over a year later and despite Zoey identifying it as K.C.'s knife at trial. Hart

22.

stated that he did not ask Zoey or Savannah before trial whether the recovered knife belonged to K.C.

{¶ 88} Regarding self-defense, Hart said the first indication arose much later in the case—he believed from Anthony—and not on December 19, 2022, and that his initial focus did not include self-defense or a knife theory.

{¶ 89} Hart did not have in any of his reports that Zoey told him that Hernandez and Strunk got into a fight and Hernandez choked Strunk. It was possible that her trial testimony was the first time that she told anyone about the men getting into a fight.

{¶ 90} At no point did Zoey say in the body camera footage that she knew who shot K.C.

{¶ 91} Following Hart's testimony, the State rested.

{¶ 92} Hernandez moved for acquittal under Crim.R. 29. The trial court denied his motion.

### B. Hernandez's case

{¶ 93} Hernandez testified in his own behalf. He said that he was 17 in December 2022. He was friends with Strunk, his cousin, and on good terms with Savannah, Strunk's girlfriend, and Zoey, Savannah's sister. He also had a sexual relationship with Zoey that had been going on since October 2022. He claimed that they engaged in sexual activities every time he went to the Moss Creek trailer. Hernandez knew K.C. as Zoey's girlfriend and said that they had a good relationship and got along.

{¶ 94} On December 17, Hernandez went to the trailer for a get together. He, Strunk, Savannah, Zoey, and K.C. were there. They were drinking and smoking

23.

marijuana.  At some point, Shannon came to the party.   She took Hernandez and Savannah to the store to buy more liquor.  There were no arguments before Hernandez went to the store.  After he got back to the trailer, he continued partying for a while.

{¶ 95} Eventually, Hernandez got tired and lay down in the bedroom.  A few minutes after he went into the bedroom, Zoey came in and laid down with him and they began having sex.  Strunk came in to use the bathroom while they were having sex, but they continued.  Then K.C. walked in.  According to Hernandez, she "got mad and started cussing and then closed the door and left."  Zoey followed her out.  He could hear K.C. and Zoey yelling and arguing while he was getting dressed.  He was not able to fully dress because K.C. came back into the room.  She was "mad cussing" and had a knife in her hand.  He identified the picture of a black knife as the knife K.C. had when she came back into the bedroom.  K.C. was "swinging the knife back and forth.  She said, what you going to do now, bitch?"  Hernandez was between the bed and the wall, and K.C. started walking across the bed toward him.  Hernandez told her to stay back and not come any closer.  She kept coming toward him and got within about three feet of him, so he "pointed [his] gun at her and told her to stay back.  Don't come any closer."  K.C. kept coming toward him and "said she was going to fuck [him] up."  Then she "lunged at" him, i.e., "jumped at [him] with the knife, came towards [him]."  Hernandez fired his gun once because he believed that he was going to be stabbed, and K.C. fell.

{¶ 96} After shooting K.C., Hernandez ran out of the house.  He did so because Strunk told him to get out and because he was scared.  The door to the bathroom, where Strunk was, was open when Strunk told him to leave.  After he left the trailer, he called

24.

his cousin to pick him up. He stayed with his sister overnight and went to his mother's house the next day when he learned that the police were there so he could turn himself in.

{¶ 97} Hernandez said that he shot K.C. because he had never seen her that mad before, she kept coming toward him, even after he told her to stop, she had a knife in her hand and lunged at him, and he believed that she was going to stab and kill him.

{¶ 98} On cross-examination, Hernandez said that Zoey and Savannah were lying about him getting into a fight with Strunk and him standing at the end of the bed, Savannah was lying about the baby being in his crib when he and Zoey were in the bedroom because Savannah had taken him to the other bedroom about an hour before the shooting, and Shannon was lying about leaving the trailer because he waved a gun around and made her uncomfortable. He believed that K.C. was angry with both him and Zoey after catching them having sex.

{¶ 99} Hernandez said that everyone in the trailer was drunk to some degree that night.

{¶ 100} When Hernandez was running, the gun fell out of his pocket, and he kept running because he did not care about it. He denied removing the shell casing from the trailer.

{¶ 101} Regarding what happened in the bedroom, Hernandez affirmed that Zoey came in and lay next to him and they had sex while Anthony was in the bathroom with the door open for approximately 10 to 15 minutes. His gun was on the nightstand next to the bed. The first time K.C. came into the bedroom, she was mad, yelling, and cussing, but her anger was mostly directed at Zoey. After she left the room, Zoey went after her, 25.

and Hernandez could hear them yelling at each other. A short time later, while Hernandez was attempting to get dressed, K.C. came back into the bedroom with a knife in her hand. Hernandez grabbed his gun as soon as he saw the knife. K.C. was swinging her arms and saying, "what you going to do now, bitch?" Hernandez "[t]old her to stay back. Don't come closer." K.C. hopped on the bed and started walking across it toward Hernandez, who told her again to stay back and not come closer. As she was walking on the bed, he was backing away toward the baby's crib. K.C. was on the ground with the knife raised above her shoulder and two to three feet away from Hernandez when she lunged at him. He had pulled his gun out and told her to stay back. She told him that she was "going to fuck [him] up" right before lunging at him. After shooting K.C., Hernandez ran because Strunk told him to and because he was scared. Strunk told him to leave while he was standing in the bathroom doorway.

{¶ 102} Hernandez denied having the gun out and pointing it during the party, though he acknowledged that it was on the counter at times and said that he kept it in his pocket until he put it on the nightstand. He said Savannah, Zoey, and Shannon were lying to the extent they claimed otherwise. He believed that K.C. knew that he had a gun.

{¶ 103} Following his testimony, Hernandez renewed his Crim.R. 29 motion, which the trial court denied. Then, Hernandez rested.

### C. Outcome and sentencing

{¶ 104} The jury found Hernandez not guilty of murder in count 1 and guilty of murder in count 2, felonious assault, and both firearm specifications. The trial court sentenced him to 15 years to life in prison on count 2, 8 to 12 years in prison on count 3,

26.

and three years in prison on each specification. It ordered the felonious assault sentence to be served concurrently with the murder sentence for an aggregate prison sentence of 18 years to life.

{¶ 105} Hernandez now appeals, raising one assignment of error:

> Mr. Hernandez's convictions for murder and felonious assault were against the manifest weight of the evidence.

## II. Law and Analysis

{¶ 106} In his assignment of error, Hernandez argues that his conviction is against the manifest weight of the evidence because the State failed to prove any of the elements of self-defense. He contends that the testimony of Zoey, Savannah, and Shannon is not credible, Zoey was at fault in creating the situation giving rise to the affray, and the police did not investigate whether and how the knife on the counter was involved in the shooting. The State responds that Hernandez was at least partially at fault in creating the situation because he chose to take a gun to a party that "he knew involved a sex triangle among him, Zoey, and K.C." And, despite knowing that "the party was a drunken and potentially volatile situation," Hernandez chose to have sex with Zoey. Additionally, the State contends that Hernandez lacked a bona fide belief that he was in imminent danger of death or great bodily harm and he used excessive force because K.C. did not have a knife when she went into the bedroom.

{¶ 107} Under R.C. 2901.05(B)(1), "[a] person is allowed to act in self-defense . . . ." "A person may use deadly force in self-defense where he (1) was not at fault in creating the situation giving rise to the affray; (2) had a bona fide belief that he was in

27.

imminent danger of death or great bodily harm and that his only means of escape from such danger was in the use of such force; and (3) did not violate any duty to retreat or avoid the danger." *State v. Lathan*, 2024-Ohio-2514, ¶ 77 (6th Dist.), citing *State v. Messenger*, 2022-Ohio-4562, ¶ 14. Once the defendant presents a viable self-defense claim, the State must disprove one of the elements beyond a reasonable doubt to defeat the claim. *State v. Weemes*, 2025-Ohio-2319, ¶ 32 (6th Dist.).

{¶ 108} When we review a claim that a verdict is against the manifest weight of the evidence, we weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether the trial court clearly lost its way in resolving evidentiary conflicts so as to create such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997). We do not view the evidence in a light most favorable to the prosecution. "Instead, we sit as a 'thirteenth juror' and scrutinize 'the factfinder's resolution of the conflicting testimony.'" *State v. Robinson*, 2012-Ohio-6068, ¶ 15 (6th Dist.), quoting *id.* at 387. Reversal on manifest weight grounds is reserved for "'the exceptional case in which the evidence weighs heavily against the conviction.'" *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist. 1983). "When reviewing a manifest weight claim involving self-defense, the court reviews the entire record, considers the credibility of witnesses, and determines whether the trier of fact clearly lost its way and created a manifest miscarriage of justice with respect to its finding that the State disproved at least one of the self-defense elements beyond a reasonable doubt." *Weemes* at ¶ 33.

{¶ 109} Although we consider the credibility of witnesses under a manifest-weight standard, we must, nonetheless, extend special deference to the jury's credibility determinations, given that it is the jury that has the benefit of seeing the witnesses testify, observing their facial expressions and body language, hearing their voice inflections, and discerning qualities such as hesitancy, equivocation, and candor. *State v. Fell*, 2012-Ohio-616, ¶ 14 (6th Dist.).

{¶ 110} The bona fide belief element of self-defense is a combined subjective and objective test. *State v. Woods*, 2023-Ohio-3549, ¶ 54 (6th Dist.), citing *State v. Lane,* 2023-Ohio-1305, ¶ 24 (6th Dist.); and *State v. Thomas,* 77 Ohio St.3d 323, 330 (1997). "A bona fide belief requires weighing the use of force against the believed danger, permitting 'only such force as is necessary to repel an attack.'" *Id.*, quoting *Lane* at ¶ 24; *State v. Barker,* 2022-Ohio-3756, ¶ 28 (2d Dist.). Furthermore, where the use of force "'was so disproportionate that it shows a purpose to injure, self-defense is unavailable.'" *Id.* at ¶ 56, quoting *Barker* at ¶ 28. Under this element, the factfinder must consider the genuineness and reasonableness of the defendant's belief and whether, under the circumstances, he exercised a careful and proper use of his own faculties. *State v. Links*, 2025-Ohio-264, ¶ 22 (6th Dist.), citing *State v. Stevenson*, 2018-Ohio-5140, ¶ 42 (10th Dist.); and *State v. Sheets*, 115 Ohio St. 308, 310 (1926). Accordingly, the second element of self-defense generally requires the trier of fact to evaluate the defendant's credibility. *Id.*, citing *State v. Olsen*, 2023-Ohio-2254, ¶ 57 (11th Dist.); and *State v. Walker*, 2021-Ohio-2037, ¶ 13 (8th Dist.).

29.

**{¶ 111}** Here, the jury did not lose its way or create a manifest miscarriage of justice by finding that the State disproved Hernandez's self-defense claim because the evidence supports a finding that Hernandez did not have a bona fide belief that he was in imminent danger of death or great bodily harm and that his only means of escape from the danger was the use of deadly force. Zoey and Savannah each testified that K.C. was emptyhanded when she went into the bedroom immediately before Hernandez shot her—i.e., she did not have a knife in her hands when she approached Hernandez in the bedroom. Officers did not find a knife on or around K.C. or in the bedroom. And immediately after the shooting, Savannah saw Zoey, who did not have anything in her hands except for her phone. Although Hernandez testified that K.C. did have a knife, "[i]t is well settled that a conviction is not against the manifest weight of the evidence simply because the [trier of fact] rejected the defendant's version of the facts and believed the testimony presented by the state." (Second brackets in original and internal quotations omitted.) *State v. Tuggle*, 2023-Ohio-3965, ¶ 64 (6th Dist.), citing *State v. Hughkeith*, 2023-Ohio-1217, ¶ 58 (8th Dist.).

**{¶ 112}** Moreover, "[w]hen there is more than one believable interpretation of the evidence, we do not choose which theory we believe is more credible and substitute it for the theory chosen by the [fact-finder]." (Brackets in original and internal quotations omitted.) *Id.*, citing *State v. Rydarowicz*, 2023-Ohio-916, ¶ 81 (7th Dist.). Because that is the case, we accept the jury's conclusion that it was not objectively reasonable for Hernandez to believe that he was in imminent danger of death or great bodily harm, so the state disproved the bona-fide-belief element of self-defense beyond a reasonable

30.

doubt.  Additionally, because the state need only disprove one element of self-defense, we need not address the remaining elements.  *State v. Fisher*, 2024-Ohio-5520, ¶ 38 (6th Dist.).  Hernandez's assignment of error is not well-taken.

### III. Conclusion

{¶ 113} For the foregoing reasons, the August 30, 2024 judgment of the Lucas County Court of Common Pleas is affirmed.  Hernandez is ordered to pay the costs of this appeal under App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.


Thomas J. Osowik, P.J.
_____
                                                                JUDGE
Christine E. Mayle, J.

Myron C. Duhart, J.                                _____
CONCUR.                                                   JUDGE

_____
                                                                JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions.  Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.